## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| MATRIXCARE INC., a Delaware corporation, | ) ) ) | Case No. 19-cv-1684 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| NETSMART TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

## <u>COMPLAINT</u>

Plaintiff MatrixCare Inc. ("MatrixCare") for its Complaint against Defendant Netsmart Technologies, Inc. ("Defendant" or "Netsmart"), alleges as follows:

### <u>Introduction</u>

1.     On June 7-12, 2019, two Netsmart employees surreptitiously accessed MatrixCare's server that contains proprietary information and downloaded MatrixCare's proprietary database schema. Netsmart is MatrixCare's direct competitor, and, with the proprietary schema, Netsmart now has the ability to gain insights into MatrixCare's software system and even replicate portions of that software system. Netsmart's impermissible access must be stopped, and all MatrixCare proprietary information removed from Netsmart's computer systems and possession.

2.     In April 2019, MatrixCare learned that long-time customer Plum Healthcare Group, LLC ("Plum") had entered into a long-term partnership with

MatrixCare's chief competitor, Netsmart. As part of that partnership, Plum and Netsmart planned to merge, and indeed have begun merging, their information technology teams such that Plum employees are now employees of Netsmart. The goal of these steps is to "leverage their collective knowledge."

3.    Concerned with protecting its intellectual property, MatrixCare sought to limit Plum's access to certain proprietary information available via a Direct Database Access link (called the "Bridge" or "DDA" and described in full below).

4.    Plum filed for and obtained a temporary restraining order from the Superior Court of California forcing MatrixCare to provide Plum with access to MatrixCare's database via the Bridge. Attempting to balance Plum's concerns with patient safety and the risk to MatrixCare's intellectual property, the Court restored Plum's direct access to the database via two computer-automated accounts, but ordered accounts tied to Plum individuals be deactivated such that no humans were accessing MatrixCare's database (*i.e.*, automated access vs. manual access). The order also required Plum to work with Netsmart to establish an ethical wall to isolate Plum's former employees from Netsmart's development staff.

5.    There is a significant difference between Plum's versus Netsmart's right to access MatrixCare's servers containing proprietary information. Plum's access is premised on its confidentiality agreement with MatrixCare, which prevents the disclosure of confidential information, such as MatrixCare's proprietary schema, to third parties. Conversely, Netsmart has no agreement with MatrixCare that would permit access to MatrixCare's computer systems, let alone to download proprietary information like a

schema. MatrixCare has not and would not grant Netsmart, its chief competitor, access to its confidential information.

6.      Employees of Netsmart (*i.e.*, former employees of Plum familiar with MatrixCare's database) used a manual login (*i.e.*, confidential information obtained while employed at Plum) to access an automated batch account that opened the door to MatrixCare's servers. The Netsmart employees ran multiple queries and downloaded MatrixCare's confidential and proprietary information, namely its schema. MatrixCare's logs prove this.

7.      MatrixCare never authorized Netsmart's access to MatrixCare's servers containing the proprietary information or Netsmart's download of MatrixCare's trade secrets, and Netsmart had no rights via contract or by virtue of a court order to do so.

8.      Netsmart's own attorney admits that Netsmart employees' access to MatrixCare's database via the Bridge is "strictly prohibited."

9.      As a result of this improper accessing and misappropriation, MatrixCare's direct competitor now has MatrixCare's valuable trade secret information to use to its advantage and continues to have access to MatrixCare's proprietary information, all to the harm of MatrixCare.

10.     Netsmart has also engaged in false advertising and defamation, targeting MatrixCare's customers with false statements regarding the services being offered by MatrixCare.

11.     On June 19, 2019, Netsmart sent MatrixCare customer, LarksField Place, a marketing email claiming that MatrixCare "will no longer be supporting AOD in the near

future thus forcing your organization to implement a whole new software." The marketing email then went on promote and encourage LarksField Place to consider switching to Netsmart for its software needs.

12.     The statements made by Netsmart are false and likely to deceive the targeted recipients and harm MatrixCare.

## **The Parties**

13.     MatrixCare is a corporation organized under the laws of Delaware, with a place of business at 10900 Hampshire Avenue South, Suite 100, Bloomington, Minnesota 55438.

14.     Netsmart is a corporation organized under the laws of Delaware, with a place of business in 4950 College Boulevard, Overland Park, Kansas 66211.

## Jurisdiction and Venue

15.     This is an action for misappropriation of trade secrets under the federal Defend Trade Secret Act, 18 U.S.C. § 1836 *et seq.* and the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01 *et seq.*; the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; false advertising under the Lanham Act, 15 U.S.C. § 1125(a); defamation under Minnesota state law; and intentional interference with contractual relations under Minnesota state law.

16.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 based on MatrixCare's claims under 18 U.S.C. § 1836(c), 18 U.S.C. § 1030(g), 15 U.S.C. § 1125(a). In particular, MatrixCare's claims under the Defend Trade Secrets Act relate to trade secrets associated with MatrixCare's proprietary software that is used in,

and intended for use in, interstate commerce. *See* 18 U.S.C. § 1836(b)(1). In fact,

MatrixCare sells to customers in Minnesota and across the United States and has

customers that use its software in Minnesota and across the United States. Separately,

Netsmart's accessing of MatrixCare's computer system without authorization, or

exceeding authorized access, resulted in a loss to MatrixCare during 2019 totaling more

than $5,000. MatrixCare's employees, including its Chief Technology Officer, IT staff,

and in-house counsel, devoted time and effort that was essential to remedying the harm

caused by Netsmart, responding to Netsmart's bad acts, and assessing the damages from

those bad acts. This is time that should have been, but was not, spent conducting

MatrixCare's day-to-day operations. Moreover, MatrixCare was forced to engage outside

counsel and a computer forensic expert due to Netsmart's bad acts and to recover the

schema that Netsmart took.

17.     The Court has supplemental jurisdiction over the state law claims pursuant

to 28 U.S.C. § 1367.

18.     Personal jurisdiction over Netsmart is proper under Minnesota's Long Arm

Statute, Minn. Stat. § 543.19, and the Due Process Clause of the U.S. Constitution.

Pursuant to Minn. Stat. § 543.19, subd. 1 (2), Netsmart regularly transacts business

within this state. Netsmart is a registered business with the Minnesota Secretary of State.

Netsmart also has contracts with and regularly provides services to clients located in

Minnesota and touts its relationship with those clients. For example, Netsmart issued a

statement touting that it had entered into contracts totaling approximately $1,137,725 to

provide the State of Minnesota and Hawaii with behavior healthcare-related software and services. The State of Minnesota has been a client of Netsmart for about 20 years. (Ex. 1.)

19.     Netsmart has also targeted Minnesota in offering its products and services. For example, Netsmart submitted a response to a request for proposal to Scott County, Minnesota for the purchase and implementation of an EHR information system and even visited Scott County to demonstrate their system. (Ex. 2 (excerpts from an Agenda for Scott County Minnesota; the full agenda is available at

https://scottcountymn.gov/AgendaCenter/ViewFile/Agenda/_04042017-491).)

20.     Netsmart also provides services to multiple non-governmental entities in Minnesota including at least Charter House located in Rochester; Colonial Acres Health Care Center in Golden Valley; St. Anthony Health Care Center in St. Anthony; and the Birches at Trillium Woods in Plymouth.

21.     Netsmart has client development and/or client support personnel assigned to the Minnesota territory or a regional territory that includes Minnesota, including Mr. Adam Clark referenced in Netsmart's deceptive and defamatory email.

22.     MatrixCare has customers located in Minnesota that use the AOD platform, including, for example, Beacon Specialized Living Services and Covenant Retirement Communities.

23.     Upon information and belief, Netsmart has targeted MatrixCare customers located in Minnesota and across the United States who use the AOD platform by sending marketing emails to those customers containing false statements regarding MatrixCare's services relating to the AOD platform.

24.     Pursuant to Minn. Stat. § 543.19, subd. 1 (3)-(4), Netsmart has also committed acts in Minnesota causing injury or property damages and/or has committed acts outside of Minnesota causing injury or property damage in Minnesota. Netsmart knows of MatrixCare, its products and services, and that it is headquartered in Minnesota as the two are direct competitors in the relatively small market for software solutions for long-term and post-acute care. Netsmart targeted its improper accessing of information at MatrixCare and then downloaded MatrixCare's proprietary schema. As a result, MatrixCare, located in Minnesota, has been harmed—its competitor now has its proprietary schema, which gives valuable and significant insights into MatrixCare's software platform.

25.     Furthermore, MatrixCare has been harmed by Netsmart's false and defamatory statements sent to at least one MatrixCare customer, and, upon information and belief, all MatrixCare customers who use the AOD platform, including customers located in Minnesota.

## Facts

### *MatrixCare's Trade Secrets*

26.     MatrixCare is an innovative electronic health record ("EHR") software company providing software solutions primarily aimed at the long-term and post-acute care industry.

27.     MatrixCare's software solutions are used by Accountable Care Organizations, skilled nursing and senior living providers, life plan communities, and home health organizations.

28.     MatrixCare's success depends on the software platform it offers to customers. That is the lifeblood of the company. MatrixCare constantly updates its software platform, making platform updates approximately quarterly.

29.     MatrixCare's software platform works in conjunction with databases of customer EHRs to make the EHRs available to the customer. To do this, MatrixCare not only developed an innovative software platform, but also an innovative schema.

30.     The schema is the blueprint of how a database is constructed. It provides an outline or model that describes the structure of the database, such as what files are present and how they are organized. The schema is read by the database software and essentially acts as a communicator between the underlying software and the database of EHRs.

31.     Possession of MatrixCare's schema would allow software programmers to replicate a portion of MatrixCare's proprietary software. With access to the schema and stored procedures (programs written on the SQL servers, also called logic), a skilled programmer would have the ability to understand how the underlying data is related and how the source code interacts with the data.

32.     MatrixCare has benefited from keeping its schema secret.

33.     MatrixCare's software, including the source code and schema, are confidential and proprietary to MatrixCare and constitute trade secrets. In addition, the database structure, and the direct database access link that was developed to provide direct access to data (*i.e.*, the Bridge) are all confidential and proprietary to MatrixCare and constitute trade secrets. Collectively, these items will be referred to as the "Proprietary Information."

34.     MatrixCare has taken reasonable efforts to protect and maintain the secrecy of its Proprietary Information, including its schema.

35.     For example, MatrixCare limits access to its schema to a select group of employees, each of which has job responsibilities related to the schema. Each of the individuals with such access is subject to confidentiality agreements.

36.     Each individual with access to MatrixCare's schema has a login and password that is required to be used to access the schema. MatrixCare maintains a log that also identifies when and where there is improper access to computer programs.

37.     MatrixCare also has measures in place to protect its Proprietary Information, including its schema, from being accessed by individuals outside of its organization and customer base. This includes firewalls that prevent third-party access to the servers where the Proprietary Information resides. MatrixCare also tests intrusion per SOC 1 Type 2 standards and is industry complaint with that standard.

38.     In addition, MatrixCare's contracts with its customers include confidentiality provisions requiring that the customer keep any confidential MatrixCare information disclosed to the customer confidential. Customers are not permitted to share user name and password access with any third party or share any MatrixCare confidential information with a third party.

39.     MatrixCare derives independent economic value from its schema by maintaining the schema's secrecy, which is not ascertainable through proper means:

- MatrixCare's schema allows it to provide customers with unique access to data in the MatrixCare database and software;

- The schema is necessary for efficient and functional provision of services to the customer;

- Keeping the schema secret allows MatrixCare to effectively compete in the EHR software industry and has enabled MatrixCare to become the nation's largest long-term and post-acute care technology provider;

- Keeping the schema secret allows MatrixCare to provide a superior product to each of its competitors; and

- Keeping the schema secret ensures that MatrixCare's competitors cannot replicate MatrixCare's software system, cannot modify their products to better compete with MatrixCare, and cannot alter their marketing strategy to better compete with MatrixCare.

*MatrixCare's Relationship with Plum and Plum's Access to the Database via the Bridge*

40.     For many years, MatrixCare served as a vendor to Plum, providing Plum with EHR software solutions. That relationship was memorialized in a "Contract for Achieve Matrix Applications and Services" dated November 15, 2006 ("the Agreement"). The Agreement placed confidentiality obligations on both parties.

41.     In addition to the services offered pursuant to their Agreement, MatrixCare provided Plum with special access to MatrixCare's database of EHRs. That special access is called Direct Data Access ("DDA" or the "Bridge").

42.     The special access offered by the Bridge was provided to Plum in approximately 2011, in response to Plum's desire to use certain tools to run analytics on its EHRs.

43.     In essence, the Bridge permitted Plum to use a VPN connection to fully access and view the MatrixCare database containing Plum's EHRs so that Plum could use

its tools for analytics. This Bridge gave Plum access to Plum's EHRs and MatrixCare's Proprietary Information.

44.     This access was not given to all Plum employees. Rather, it was limited to specific Plum employees who each had individual Plum usernames and passwords. Those passwords were required to log into MatrixCare's database. In addition, Plum had several automated computer accounts through which healthcare practitioner computers could automatically access MatrixCare's database through the Bridge and gather relevant information.

45.     Pursuant to the confidentiality provision in the Agreement, Plum was to treat MatrixCare's confidential information as confidential and take reasonable precautions to prevent its acquisition by unauthorized persons.

46.     No other MatrixCare customer had or has a similar level of direct access to MatrixCare's Proprietary Information as Plum. Other customers that have had or have limited directed access (at a level much lower than Plum) are also subject to confidentiality requirements.

47.     On or around April 25, 2019, MatrixCare learned that Plum was entering into a long-term partnership with MatrixCare's chief competitor Netsmart and that Plum was planning to terminate its Agreement with MatrixCare.

48.     MatrixCare further learned that as part of that partnership, Plum and Netsmart would be merging technology teams such that employees on Plum's technology team would become employees of Netsmart.

49.     Plum and Netsmart's joint press release announced that Plum:

joined with healthcare IT company Netsmart in a 10-year strategic partnership to innovate technology solutions and services.

\*     \*     \*

Plum and Netsmart *will merge technology teams* to effectively form one team focused on the advancement of Plum strategic initiatives through the use of technology. Plum will have access to a robust and extensive pool of Netsmart experts as well as industry-leading technology and resources. *The combined team will leverage their collective knowledge* to develop appropriate solutions and services to support integrated healthcare.

(Ex. 3 (emphasis added).)

50.    This process has already started, and at least some former Plum employees are now, admittedly, Netsmart employees.

51.    Because Netsmart is a direct competitor, MatrixCare immediately became concerned with protection of its intellectual property, particularly in view of Plum's special access to MatrixCare's Proprietary Information via the Bridge.

52.    MatrixCare sent a May 3, 2019 letter to Netsmart expressing its concerns regarding protection of its intellectual property and expressly advising Netsmart that Plum was prohibited from disclosing any MatrixCare confidential information and trade secrets or from using such information other than for its own internal support purposes for which it has been licensed. (Ex. 4.)  That letter also cautioned Netsmart from interfering with MatrixCare and Plum's relationship. (*Id.*)

53.    To further protect its intellectual property, MatrixCare sought to terminate Plum's access via the Bridge (but not Plum's access to its EHRs all together).

54.    Terminating Plum's access via the Bridge would not impact Plum's ability to access patient records; rather, MatrixCare offered to provide Plum access to its information and the ability to run many of the analytics it was currently running, but in a

manner that did not also give Plum and Plum employees transitioning to Netsmart access to MatrixCare's Proprietary Information.

*Plum Obtains a Court Order Requiring MatrixCare Provide It with Non-Human Access to MatrixCare's Database via the Bridge*

55.     On May 29, 2019, Plum filed a motion for a temporary restraining order in the Superior Court of California, County of San Diego North County Division, asking the Court to enjoin MatrixCare from terminating access via the Bridge. Plum alleged that eliminating access via the Bridge would negatively impact Plum's customers and those customers' patients, namely skilled nursing facilities servicing elder patients. In particular, Plum alleged that it needed access via the Bridge for real-time analysis of patient data to determine trends (*e.g.*, a flu outbreak) which protect the health of elder patients in such skilled nursing facilities.

56.     After Plum and MatrixCare were unable to reach an amicable resolution, the Court ordered MatrixCare to provide Plum with access to the database via the Bridge, citing the health and safety needs of elder and infirm adults (the "TRO").

57.     However, the Court recognized and attempted to balance the two competing concerns—patient safety and protection of MatrixCare's intellectual property—by instituting safeguards with regard to MatrixCare's intellectual property.

58.     The Court ordered all IT support individuals to sign Non-disclosure Agreements agreeing not to disclose MatrixCare's intellectual property and to attest to the fact that they had not misappropriated any of MatrixCare's confidential information or intellectual property.

59.     Furthermore, the TRO only permitted access to MatrixCare's database via the Bridge through non-human, computer-automated accounts: there was to be no human interaction by Plum within MatrixCare's database. In other words, no humans were to log in via the Bridge to manually access the database.

60.     The TRO also required Plum to work with Netsmart to establish an ethical wall to segregate Plum's former employees from Netsmart's development staff.

61.     The Court's TRO and the transcript from the hearing, both of which are incorporated in full, make clear that there was to be no human interaction by Plum within MatrixCare's database. (Ex. 5; Ex. 6.)

62.     The Court expressly struck from Plum's Proposed Order language that would have permitted its personnel to access MatrixCare's database via the Bridge:

> 2.     Defendant shall specifically permit the following user accounts to log into the VPN, and to have all of the same access they did prior to the cut-off: Plum_batchrunner, Plum_Primeview, Plum_informatica, Plum_csannicolas, and Plum_svcorialogsti;
>
> 3.     Defendant shall deactivate the following user accounts that were previously used with the VPN: Plum_sanderson, Plum_jsnyder, Plum_majones, and Plum_khansen;

(Ex. 5.) Among others, the Court removed the personnel access rights of Plum accounts for Messrs. Chris San Nicholas (username Plum_csannicolas) and Kyle Hansen (username Plum_khansen) as well as the computer-automated account Plum_informatica.

63.     Pursuant to the Court Order, MatrixCare removed access to these accounts.

64.     Plum understood and agreed, on the record, that there was to be no human interaction by Plum within MatrixCare's database:

**Mr. Lamagna [Counsel for Plum]:** We have a proposed order where we will take it, access to the Bridge, with only the electronic accounts - - only the electronic account. No -- humans.

(Ex. 6 at 9:23-28.)

65.     Plum's counsel brushed off MatrixCare's concerns that there was no way to only give access to the computer-automated accounts (also referred to as electronic accounts) and that the computer-automated accounts had to be operated by humans:

**Mr. Lamagna [Counsel for Plum]:** What they're concerned about is that even though the electronic account will be operated, there's  - - it's always possible for a human to actually act like it's the electronic account. So the human can pose as the robot and come in and take the information. We are talking about conspiracy theories, that we are going to subvert this court to take the information and share it elsewhere. We are also going to take a court order from your Honor that we don't do that.

So if they're concerned that a human is going to be involved with the electronic accounts, you just order no human access.

(Ex. 6 at 10:15-11:3.)

66.     MatrixCare's fears were no conspiracy theory. In fact, MatrixCare's exact fears were realized: Netsmart employees (former Plum employees familiar with MatrixCare's database) used Plum's computer-automated accounts to manually access MatrixCare's database that contains its Proprietary Information in the same manner as the individual accounts previously did and to, among other things, download MatrixCare's confidential and proprietary schema.

*Netsmart Employees Access and Download MatrixCare's Trade Secrets*

67.     On approximately June 12, 2019, MatrixCare discovered that humans had used Plum's computer-automated accounts to access MatrixCare's database and to, among other things, download MatrixCare's Proprietary Information.

68.     MatrixCare's logs show that starting on June 7, 2019, through June 12, 2019, Plum's computer-automated accounts accessed MatrixCare's database (containing the Proprietary Information) using Microsoft SQL Server Management Studio. (Ex. 7.)

69.     Use of Microsoft SQL Server Management Studio necessarily means that humans were interacting with the database because using that tool requires manual logins that are input by humans and requires a user to enter specific queries against the files on the server.

70.     The logs further prove that not only did humans access MatrixCare's database but also that MatrixCare's schema was downloaded and queries were run against the schema:

| 131 | 4081 | SELECT SCHEMA_NAME(obj.schema_id) AS [Schema], https://protect-us.mimecast.com/s/PH-hC68 | LPHG-032939 | | Microsoft SQL Server Management Studio - T Plum_batchrunner |
| 127 | 4077 | SELECT (select schema_name()) AS [DefaultSchema] | LPHG-032939 | | Microsoft SQL Server Management Studio - T Plum_batchrunner |
| 723 | 5133 | SELECT https://protect-us.mimecast.com/s/y-f7ClYpIxuEwJ4FJ0FaE?domain=satypes.name AS [Schema], h | SQLDB-DEV | | Microsoft SQL Server Management Studio - T Plum_batchrunner |

(Ex. 7 at lines 131, 127, 723.) In order to run the queries set forth in the logs, the humans accessing the information necessarily had to download a copy of MatrixCare's proprietary schema onto at least three computers (i.e., SQLDB, LPHG-032939, and SQLDB-DEV). (Ex. 7.)

71.     Further, the logs show that Plum_batchrunner has been accessing the server in the same manner as Plum had previously been using the now unauthorized

Plum_informatica login. In essence, the user name Plum_batchrunner is accessing the computer application Informatica to provide an alternative access point to the Informatica program since the TRO prohibited use of the Plum_informatica login.

72.     In particular, Plum consistently accessed the computer program Informatica from the computer called PDH-ETL. Prior to June 1, 2019 and the TRO, the only user name used with the PDH-ELT computer was Plum_informatica. The below are screenshots taken from Microsoft SQL Server Management Studio:



73.     Prior to June 1, 2019 and the TRO, the user name Plum_batchrunner was never used to access the Informatica information via the PDH-ETL computer.

74.     Upon information and belief, the Plum_batchrunner login and account was used as a backdoor method to run the Informatica program since the username Plum_informatica had been shut off pursuant to the TRO.

*Netsmart Admits It Is NOT Permitted to Access MatrixCare's Database and Plum Admits that Netsmart Employees Did Just That.*

75.     As part of its efforts to protect its intellectual property following entry of the TRO, MatrixCare reached out to Ms. Jennifer Utting, counsel for Netsmart. On or around June 11, 2019, Ms. Uttinger both verbally and in writing confirmed access to MatrixCare's database via the Bridge by Netsmart employees was "strictly prohibited."

From: Utting, Jennifer [mailto:JUtting@ntst.com]
Sent: Tuesday, June 11, 2019 4:37 PM
To: Lawrence G. Green <lgreen@burnslev.com>
Cc: Perlin, Scott <perlin@scmv.com>; Myers, Andrea <myers@scmv.com>; Laura Lee Mittelman <lmittelman@burnslev.com>; Eric Chan <echan@HEALTH-LAW.COM>
Subject: RE: MatrixCare/Plum/Netsmart

We acknowledge and agree.

From: Lawrence G. Green <lgreen@burnslev.com>
Sent: Tuesday, June 11, 2019 2:49 PM
To: Utting, Jennifer <JUtting@ntst.com>
Cc: Perlin, Scott <perlin@scmv.com>; Myers, Andrea <myers@scmv.com>; Laura Lee Mittelman <lmittelman@burnslev.com>; Eric Chan <echan@HEALTH-LAW.COM>
Subject: RE: MatrixCare/Plum/Netsmart

Thank you for preparing and forwarding this, Jennifer. I will review with my client. In the meantime, I am confirming that under the terms of the TRO, any such access below that is through the bridge is strictly prohibited.

Thx again,
Larry

**Lawrence G. Green**
Partner
D 617.345.3216
lgreen@burnslev.com

Burns & Levinson LLP
125 Summer Street Boston, MA 02110
P 617.345.3000 | F 617.345.3299
Bio | burnslev.com

(Ex. 8.)

76.     Despite this express acknowledgement, during this same time period Netsmart employees were accessing MatrixCare's database via the Bridge.

77.     Counsel for Plum admitted that its computer-automated accounts had been used by two Netsmart employees to access MatrixCare's database. (Ex. 9.)

78.     In particular, on June 12, 2019, counsel for MatrixCare wrote counsel for Plum stating that MatrixCare believed that Plum had used human access to extract data through the Bridge and requested that Plum's counsel review the matter with his client. (*Id.*)

79.     That same day, Plum's counsel, Mr. Eric Chan, confirmed that MatrixCare was correct: humans had used Plum's computer-automated account to access MatrixCare's database through the bridge. (*Id.*)

80.     But it was not Plum employees that did this. Mr. Chan admitted that the two individuals that accessed MatrixCare's database through the Bridge (Mr. Chris San

Nicholas and Mr. Kyle Hansen) were, in fact, employees of Netsmart who used to be Plum employees. (*Id.*)

81.     Plum's counsel attempted to characterize Mr. San Nicholas's and Mr. Hansen's access as incidental and necessary due to technological problems encountered with regard to the Bridge. He further represented that one test query (a census) was run in the database to confirm the database was working. (*Id.*)

82.     The logs show otherwise. The logs show 927 entries and that at least 66 queries were made by humans over a period of 6 days and, of course, show that MatrixCare's schema was downloaded and queries run against that schema. (Ex. 7.)

83.     Neither Plum nor Netsmart ever informed MatrixCare of any technological problems with the Bridge or database that would require human interaction with the database or requested IT help or support from MatrixCare regarding the same.

84.     Netsmart also used Plum's Plum_batchrunner account as a backdoor way to run the Informatica program and obtain MatrixCare information.

85.     The Informatica program is an off-the-shelf software product that can be used to access and pull information out of databases. It provides deep analysis tools for data and provides details related to the database structure and logic. Combined with access to the schema, a programmer could use the details from Informatica to reverse engineer portions of MatrixCare's computer system.

86.     MatrixCare never authorized Netsmart to access its servers and Proprietary Information, let alone download its proprietary schema. Nor did MatrixCare authorize Netsmart to access its servers and gather information via the Informatica program.

87.     Netsmart had no contract with MatrixCare that would give it permission or a license to access MatrixCare's servers and Proprietary Information or download MatrixCare's schema. In fact, MatrixCare would never grant Netsmart such access.

88.     Netsmart was not a party to the TRO proceedings and was not the subject of the TRO entered by the Court:

> **Mr. Perlin [counsel for MatrixCare]:** [O]ne of the main issues here is that our biggest competitor, Netsmart, is merging their technology with Plum, and Netsmart is not a party to this action. The court cannot order Netsmart to do anything.

> **The Court:** Well, they're not asking me to.

(Ex. 6 at 11:5-10; *see also*, Ex. 5 [TRO] (identifying parties to TRO as Plum and MarixCare).

89.     Messrs. San Nicholas and Hansen, individuals who accessed MatrixCare's databases using Plum's automated accounts, were two individuals whose personal accounts were deactivated by the California Court in its TRO. Messrs. San Nicholas and Hansen knew that their personal access was unauthorized and improper.

90.     Upon information and belief, Netsmart also knew that as a result of the TRO, the Plum_informatica account was deactivated.

91.     Netsmart had no right to access MatrixCare's database via the Bridge or download MatrixCare's database. It admits that (*see*, *supra*, ¶ 75), but it did it anyway.

92.     In short:

- Netsmart admits it was "strictly prohibited" from accessing MatrixCare's database via the Bridge;

- Plum admits that two Netsmart employees used Plum's automated computer accounts to access MatrixCare's database which contain Proprietary Information;

- Logs and Mr. Chan's admission show that Netsmart employees not only accessed MatrixCare's database but also downloaded MatrixCare's schema and ran queries against that schema; and

- Logs and Mr. Chan's admission show that Netsmart employees used (and continue to use) the Plum_batchrunner account as a backdoor method to run the Informatica program and access and obtain additional information it was not authorized to access or possess.

93.    MatrixCare has been irreparably harmed by Netsmart's bad acts. Netsmart is MartrixCare's biggest competitor, and Netsmart now has MatrixCare's proprietary schema and continued access to MatrixCare's Proprietary Information.

94.    With the schema, Netsmart can now better understand MatrixCare's database, software, and the inter-relation between the two. Netsmart has the blueprints from which it can understand MatrixCare's platform and the solutions provided to customers. Netsmart can now use that to its advantage, for example, by modifying its own products offerings to better compete with MatrixCare or by improving upon its marketing to customers based on its understanding of MatrixCare's platform.

95.    Netsmart is not a healthcare provider like Plum. It is a software and IT company directly competing with MatrixCare. Netsmart must be enjoined from accessing MatrixCare's Proprietary Information. Doing so will not impair patient safety or health as Plum remains able to access MatrixCare's database via the Bridge as required under the TRO.

96.     Netsmart impermissibly accessed MatrixCare's servers containing Proprietary Information and downloaded MatrixCare's proprietary schema. The schema must be returned or destroyed by Netsmart so as to prevent any improper use by Netsmart, subject to a forensic record being created before destruction.

*Netsmart Targets MatrixCare's Customers with False and Defamatory Marketing Materials*

97.     On June 25, 2019, MatrixCare learned that Netsmart was not only impermissibly accessing MatrixCare's Proprietary Information and misappropriating its trade secret schema, but was also targeting MatrixCare's customers with false and defamatory marketing materials.

98.     Netsmart has sent at least one marketing email to a MatrixCare customer, LarksField Place, claiming that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software." (Ex. 10 (redactions for personal information; highlighting added).) The marketing email further touts that "Netsmart has you covered on the software and more" and further Netsmart "would love the opportunity to discuss what your individual needs and challenges are and how Netsmart can partner with you to find solutions." (*Id.*)

99.     AOD is a platform used by certain MatrixCare customers. The statement that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software" is false. MatrixCare has no plans to discontinue offering services associated with the AOD platform in the near future. Indeed, there is not even an end of life date for those services.

100.    Upon information and belief, Netsmart has sent the same or similar emails to MatrixCare customers that use the AOD platform located across the United States.

101.    Netsmart's false and defamatory statements are aimed at, and are likely to, deceive recipients of those statements.

102.    MatrixCare is damaged and suffers irreparable harm from Netsmart's false and defamatory statements, including harm to its goodwill and reputation with customers and in the marketplace.

## COUNT I
## THE DEFEND TRADE SECRET ACT, 18 U.S.C. § 1836 *ET SEQ.*

103.    MatrixCare realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

104.    This cause of action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*. ("DTSA").

105.    As described in paragraph 16, Netsmart's misappropriation of the schema relates to a product or services used, or intended for use, in interstate or foreign commerce.

106.    The term "trade secret" is defined under 18 U.S.C. § 1839(3) as: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing."

107.    MatrixCare's schema is trade secret within the meaning of 18 U.S.C.

§ 1839(3).

108.    MatrixCare, as described in paragraphs 34-38, takes reasonable steps to

keep its schema secret, *e.g.*, by requiring all customers to sign confidentiality agreements

and by requiring user name and password login access, and the schema is not generally

known or readily ascertainable.

109.    MatrixCare's schema derives independent economic value from

maintaining the secrecy of its schema, which is not ascertainable through proper means:

- MatrixCare's schema allows it to provide customers with unique access to data in the MatrixCare database and software;

- The schema is necessary for efficient and functional provision of services to customer;

- Keeping the schema secret allows MatrixCare to effectively compete in the EHR software industry and has enabled MatrixCare to become the nation's largest long-term and post-acute care technology provider;

- Keeping the schema secret allows MatrixCare to provide a superior product to each of its competitors; and

- Keeping the schema secret ensures that MatrixCare's competitors cannot replicate MatrixCare's software system, cannot modify their products to better compete with MatrixCare, and cannot alter their marketing strategy to better compete with Matrixcare.

110.    Netsmart knew, or should have known, the schema was confidential and a

trade secret:

- Netsmart admitted that it was prohibited from accessing MatrixCare's database via the Bridge;

- It was former Plum employees, Messrs. San Nicholas and Hansen, who were familiar with MatrixCare database, that accessed and downloaded the trade secret information. Upon information and belief, they were aware of Plum's obligation to keep MatrixCare's information confidential;

- It is well known in the software industry, of which Netsmart is a part, that schema are an integral part of the software system that allows the software and database to operate efficiently and that schemas are proprietary and confidential to the creator or owner of that schema; and

- Communications between counsel for MatrixCare and Netsmart, prior to the download of the schema, demonstrated MatrixCare viewed its software system as confidential and proprietary to it. (Ex. 4; Ex. 11.)

111.    Netsmart misappropriated MatrixCare's schema within the meaning of 18 U.S.C. §§ 1836(b), 1837, and 1839(5-6) when Netsmart employees accessed and downloaded the schema from MatrixCare's computer system to computer servers controlled by Netsmart.

112.    First, Netsmart admittedly knew it was prohibited from accessing MatrixCare's database via the Bridge such that it knew its acquisition of MatrixCare's trade secret was by improper means.

113.    Second, Messrs. Sans Nicholas and Hansen, who downloaded the schema, were former Plum employees who used Plum's usernames and passwords to gain access to MatrixCare's computer system. They knew that their personal Plum accounts had been deactivated, and they modified the automated, computer-access accounts to allow for their personal access and illegal download of MatrixCare's schema.

114.    The above actions described in paragraphs 112-113 constitute theft as well as misrepresentation. By using and modifying computer-automated accounts to allow for

their personal use, Messrs. Sans Nicholas and Hansen misrepresented who was accessing the information to permit themselves to access information they otherwise knew should not be available to them.

115.    Future use or disclosure of MatrixCare's Proprietary Information constitutes an additional, threatened misappropriation of trade secrets.

116.    MatrixCare has suffered damages as a direct and proximate result of Netsmart's misappropriation of MatrixCare's schema. The damage suffered by MatrixCare includes, without limitation, the loss of sole control over the schema and the disclosure of the information to its competitor Netsmart who can use the trade secret schema to its advantage, e.g., in connection with the sale of other computer software that incorporates that schema. Netsmart has also been unjustly enriched by its misappropriation of MatrixCare's schema.

117.    Should additional Proprietary Information be misappropriated, MatrixCare will suffer similar harms.

118.    Netsmart's access to MatrixCare's trade secret schema and threatened misappropriation of the Proprietary Information is ongoing. Netsmart's access to Proprietary Information and downloading and use of MatrixCare's trade secret schema caused and continues to cause irreparable harm to MatrixCare to which MatrixCare has no adequate remedy at law. An injunction prohibiting Netsmart and all employees and affiliates from accessing and/or using MatrixCare's Proprietary Information is necessary to provide MatrixCare complete relief. In particular, the injunctive relief should (a) prevent Netsmart from accessing MatrixCare's server or any replicated MatrixCare

database; (b) remove all instances of MatrixCare's Proprietary Information from Netsmart's computers, servers, hard drives, or other storage devices after forensic copies of the drives are made; (c) permit a computer forensic analyst of MatrixCare's choosing to verify that all Proprietary Information has been removed from Netsmart's computer system and that no copies were made; and (d) restrain Netsmart from using any of MatrixCare's Proprietary Information, including the downloaded schema and any replicated database.

119.    MatrixCare has been damaged by Netsmart's access to MatrixCare's Proprietary Information and downloading and use of MatrixCare's schema through improper means and is entitled to money damages to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(B).

120.     Netsmart's misappropriation of MatrixCare's schema was willful and malicious, and MatrixCare is entitled to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## COUNT II
## MINNESOTA UNIFORM TRADE SECRETS ACT, MINN. STAT. § 325C.01 *ET SEQ.*

121.    MatrixCare realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

122.    MatrixCare's schema constitutes a trade secret within the meaning of Minn. Stat. § 325C.01.

123.    Netsmart acquired MatrixCare's schema through improper means within the meaning of Minn. Stat. § 325C.01, subd. 2.

124.    Netsmart misappropriated MatrixCare's schema within the meaning of Minn. Stat. § 325C.01, subd. 3.

125.    Future use or disclosure of MatrixCare's Proprietary Information constitutes an additional, threatened misappropriation of trade secrets.

126.    Netsmart's access to MatrixCare's trade secret schema and threatened misappropriation of the Proprietary Information is ongoing. Netsmart's access to Proprietary Information and downloading and use of MatrixCare's trade secret schema caused and continue to cause irreparable harm to MatrixCare to which MatrixCare has no adequate remedy at law.

127.    Should additional Proprietary Information be misappropriated, MatrixCare will suffer similar harms.

128.    Netsmart's actions entitle MatrixCare to an injunction pursuant to Minn. Stat. § 325C.02 to (a) prevent Netsmart from accessing MatrixCare's server or any replicated MatrixCare database; (b) remove all instances of MatrixCare's Proprietary Information from Netsmart's computers, servers, hard drives, or other storage devices after forensic copies of the drives are made; (c) permit a computer forensic analyst of MatrixCare's choosing to verify that all Proprietary Information has been removed from Netsmart's computer system and that no copies were made; and (d) restrain Netsmart from using any of MatrixCare's Proprietary Information, including the downloaded schema and replicated MatrixCare database.

129.    As a result of Netsmart's violation of Minn. Stat. § 325C.01 *et seq.*, MatrixCare has been damaged and is entitled to damages under Minn. Stat. § 325C.03(a),

and, because the misappropriation has been willful and malicious, MatrixCare is entitled

to exemplary damages under Minn. Stat. § 325C.03(b) and reasonable attorneys' fees

under Minn. Stat. § 325C.04.

**COUNT III**
**COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)**

130.    MatrixCare realleges and incorporates herein by reference the allegations

contained in all previous paragraphs herein.

131.    Netsmart has knowingly and with intent to defraud accessed MatrixCare's

protected computer system without Matrixcare's authorization and has furthered the

intended fraud and obtained an item of value. Its actions constitute a violation of the

Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

132.    Netsmart accessed MatrixCare's protected computers without the

permission or authorization of MatrixCare to obtain confidential information belonging to

MatrixCare. As described above, Netsmart admittedly knew that it was not authorized to

access MatrixCare's computer servers, and Netsmart employees Mr. San Nicholas and

Mr. Hansen knew their personal access had been cut off and used the computer-

automated access accounts to allow for their personal access and manipulation.

133.    MatrixCare's computer system is protected. MatrixCare's computers are

used in or affect interstate commerce or communications. MatrixCare's computer

systems host and transmit EHRs for their customers that are located throughout the

United States. MatrixCare's computer systems also communicate with those customers,

including through the sending of emails by MatrixCare employees to customers located throughout the United States.

134.   Netsmart, through the manual access to MatrixCare's computer system, obtained an item of value—its competitor MatrixCare's proprietary and confidential schema as well as access to Proprietary Information.

135.   Netsmart's actions were intentional and without MatrixCare's knowledge, permission, or authorization.

136.   As a direct result of Netsmart's unauthorized and impermissible access in violation of 18 U.S.C. § 1030, MatrixCare has lost more than $5,000 during the one-year period of time starting at the time when Netsmart accessed MatrixCare's computer system. It has spent numerous hours investigating, analyzing, and documenting Netsmart's access, what was accessed, what was taken, and potential remedies to prevent the same from happening again. And, pursuant to 18 U.S.C. § 1030(c)(4)(A)(i)(I), MatrixCare executives, IT team, and in-house counsel have spent more than $5,000 in responding to Netsmart's violation of 18 U.S.C. § 1030. In addition, MatrixCare has incurred extensive fees from outside counsel and a computer forensic expert as result of responding to Netsmart's violation.

137.   MatrixCare will continue to be injured irreparably, while Netsmart will be unjustly enriched until all of the proprietary information obtained via the improper access is returned to the custody and care of MatrixCare and no longer resides on Netsmart computer systems.

138.   MatrixCare is entitled to injunctive relief for Netsmart's violation under 18 U.S.C. § 1030(g).

## COUNT IV
## LANHAM ACT, 15 U.S.C. § 1125(a)

139.   MatrixCare realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

140.   Netsmart communicated to at least MatrixCare customer LarksField Place, claiming that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software."

141.   Upon information and belief, Netsmart communicated similar claims to other MatrixCare customers who use the AOD platform.

142.   These statements were made in a commercial advertisement (*i.e.*, a marketing email) in which Netsmart was addressing MatrixCare's service offerings as well as its own service offerings.

143.   The statement that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software" is false and is likely to deceive a substantial segment of the audience who receives this marketing email.

144.   The deception is material in that it is likely to influence purchasing decisions of consumers in the relevant marketplace. Indeed, the ability to support a particular software platform that is currently being used by a customer would be of significant importance to that customer.

145.    MatrixCare has been damaged and suffers irreparable harm from Netsmart's false and deceptive statement, including harm to its goodwill and reputation with customers and in the marketplace.

146.    MatrixCare is entitled to injunctive relief pursuant to 15 U.S.C. § 1116, and actual damages, disgorgement of profits, and costs of the action pursuant to 15 U.S.C. § 1117.

147.    Netsmart's false and deceptive statements were knowingly false and were made with the intent to harm, making this case exceptional and warranting an award of attorney's fees pursuant to 15 U.S.C. § 1117.

## COUNT V
## DEFEAMATION UNDER MINNESOTA LAW

148.    MatrixCare realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

149.    Netsmart communicated to MatrixCare customer LarksField Place, claiming that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software."

150.    Upon information and belief, Netsmart communicated similar claims to other MatrixCare customers who use the AOD platform.

151.    The statement that "MatrixCare will no longer be supporting AOD in the near future thus forcing your organization to implement a whole new software" is false.

152.    Netsmart's defamatory statement negatively affects MatrixCare's business and constitutes defamation per se. MatrixCare has been damaged and suffers irreparable

harm from Netsmart's defamatory statement, including harm to its goodwill and reputation with customers and in the marketplace. MatrixCare is entitled to its damages and injunctive relief.

153.    Netsmart made its defamatory statements knowing they were false or acting with reckless disregard as to whether the statements were true, warranting an award of punitive damages.

## COUNT VI
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS UNDER MINNESOTA LAW

154.    MatrixCare realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

155.    MatrixCare and Plum had a "Contract for Achieve Matrix Applications and Services" dated November 15, 2006. (Ex. 12.)

156.    The Agreement placed confidentiality obligations on both sides. Pursuant to the Agreement, Plum was to treat MatrixCare's confidential information as confidential and take reasonable precautions to prevent its acquisition by unauthorized persons.

157.    Netsmart had knowledge of that contract. Netsmart employees Messrs. San Nicholas and Hansen were former Plum employees who knew of the confidentiality obligations in place between Plum and MatrixCare. And counsel for MatrixCare expressly advised Netsmart that Plum was prohibited from disclosing any MatrixCare confidential information and trade secrets or from using such information other than for its own internal support purposes for which it has been licensed cautioned Netsmart from interfering with MatrixCare and Plum's relationship. (Ex. 4.)

158.    Despite this, Netsmart intentionally caused Plum to breach its Agreement with MatrixCare (in particular, its confidentiality obligations) by, among other things, using Plum's log in and passwords to access confidential MatrixCare information. That was a breach of Plum and MatrixCare's Agreement, and there was no justification for doing this.

159.    MatrixCare has been harmed by Netsmart's intentional interference with its contractual relationship with Plum, at least because its Proprietary Information has now been accessed by its competitor Netsmart and its proprietary schema downloaded by Netsmart. MatrixCare is entitled to damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

MatrixCare hereby demands a trial by jury of all issues so triable.

## REQUESTED RELIEF

**WHEREFORE**, MatrixCare respectfully requests judgment against Netsmart on all causes of action and as described as follows:

A.    Entering a preliminary and permanent injunction against Netsmart and its partners, agents, servants, employees and attorneys, and those persons in active concert or participation with NetSmart:

1.      Preventing Netsmart from accessing MatrixCare's server or any replicated MatrixCare database;

2.      Removing all instances of MatrixCare's Proprietary Information from Netsmart's computers, servers, hard drives, or other storage devices after forensic copies of the drives are made;

3.      Permitting a computer forensic analyst of MatrixCare's choosing to verify that all Proprietary Information has been removed from Netsmart's computer system and that no copies were made;

4.      Restraining Netsmart from using any of MatrixCare's Proprietary Information, including the downloaded schema and any replicated MatrixCare database;

5.      Preventing Netsmart from making false statements regarding MatrixCare's product offerings, and MatrixCare's support of the same, in advertising or marketing materials, including via email, and requiring Netsmart provide MatrixCare with a list of all persons who received such statements within 72 hours of the granting of any injunctive relief and provide corrective communications to those persons.

B.  A finding that Netsmart has wrongfully misappropriated MatrixCare's trade secrets under federal and Minnesota state law;

C.  A finding that Netsmart has violated the Computer Fraud and Abuse Act;

D.  A finding that Netsmart has engaged in false and deceptive advertising in violation of the Lanham Act;

E.  A finding that Netsmart has defamed MatrixCare in violation of Minnesota law;

F.  A finding that Netsmart has tortiously interfered with contractual relations between MatrixCare and Plum;

G.  Damages as allowed under 18 U.S.C. § 1836(b)(3)(B), Minn. Stat. § 325C.03(a), 15 U.S.C. § 1117, and Minnesota law for defamation and intentional interference with contractual relations, including actual damages, disgorgement of profits, unjust enrichment damages, and/or a reasonable royalty;

H.  A finding that Netsmart's actions have been willful and malicious and that pursuant to 18 U.S.C. § 1836(b)(3)(C) and Minn. Stat. § 325C.03(b) MatrixCare is entitled to exemplary damages in twice the amount of damages awarded and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Minn. Stat. § 325C.04;

I.  A finding that Netsmart's actions have been malicious and that and pursuant to Minnesota state law for defamation, MatrixCare is entitled to punitive damages;

J.  A finding that this case is exceptional and an award of attorney's fees pursuant to 15 U.S.C. § 1117;

K.  An award for the costs of this action pursuant to 15 U.S.C. § 1117;

L.  That MatrixCare be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Netsmart's conduct;

M. That Netsmart file with this Court and serve upon MatrixCare within thirty (30) days after service upon Netsmart of an injunction in this action, a written report by Netsmart, under oath, setting forth in detail the manner in which Netsmart has complied with the injunction; and

N.  That MatrixCare be granted such other relief as the Court may deem just

and proper under the circumstances.

MatrixCare Inc.,

By its Attorneys,

Dated: June 26, 2019

MERCHANT & GOULD P.C.

/s/ William D. Schultz
William D. Schultz, MN Bar #323482
Paige S. Stradley, MN Bar #393432
Joseph W. Dubis, MN Bar #398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
wschultz@merchantgould.com
pstradley@merchantgould.com
jdubis@merchantgould.com

*Attorneys for Plaintiff MatrixCare Inc.*

## **VERIFICATION**

I, _JOHN DAMGAARD_ , DECLARE under penalty of perjury under the laws of the United States of America that the foregoing VERIFIED COMPLAINT is true and correct.

Executed on June 26, 2019.

MATRIXCARE INC.

By:

_____
Signature

_____
JOHN DAMGAARD, PRESIDENT + CEO
Name and Title