# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MatrixCare Inc., | Civ. No. 19-1684 (MJD/SER) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Netsmart Technologies, Inc., | |
| Defendant. | |

Joseph Dubis, Esq., Paige S. Stradley, Esq., and William D. Schultz, Esq, Merchant & Gould PC, counsel for Plaintiff.

Kevin D. Conneely, Esq., and Ruth A. Rivard, Esq., Stinson LLP, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

This matter comes before the undersigned on Plaintiff MatrixCare Inc.'s ("MatrixCare") Motion for Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(b) ("Motion for TRO"). (Doc. No. 9.) MatrixCare's Motion for TRO was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1. (Doc. No. 19.)

The Motion for TRO was filed prior to any discovery. In support of the motion, each party submitted evidence through declarations, affidavits, court records, and exhibits. Based on that very limited record, oral argument was held on July 3, 2019. The Court emphasizes that the facts and preliminary conclusions recited herein are not final

determinations of disputed matters binding in later stages of litigation. It is a "general rule that 'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Based on the record, files, and proceedings herein, this Court recommends that the relief requested by MatrixCare be denied.

## I.    Background

### A.    MatrixCare and its Customer Plum Healthcare Group, LLC

MatrixCare is a Delaware corporation with a place of business in Bloomington, Minnesota. (Doc. No. 1, Compl. ¶ 13.) MatrixCare designs software for Accountable Care Organizations, skilled nursing, senior living providers, life plan communities, and home health organizations. (*Id.* ¶ 27.) One of MatrixCare's customers is Plum Healthcare Group, LLC ("Plum"). (*Id.* ¶ 40.) Plum is not a party to this litigation. Plum provides support and consulting services, including access to reliable and efficient medical records to numerous skilled nursing facilities throughout the state of California. (Doc. No. 28, Decl. of Kevin D. Conneely ("Conneely Decl.") ¶ 11, Ex. 7 at 7.)

MatrixCare began working with Plum in approximately 2006 to provide Plum with electronic health records ("EHR") services. (Doc. No. 14, Affidavit of Joseph Weber ("Weber Aff.") ¶ 13.) An Applications and Services Agreement ("Agreement") was signed in 2006. (*Id.* at Ex. A.) The Agreement includes a confidentiality provision. (*Id.* at 7.) The Agreement also provides restrictions on system security. (*Id.* at 13.) MatrixCare

contends that the Agreement provisions restricted third-party access to MatrixCare's proprietary information. (Doc. No. 11, Pl.'s Br. at 7.)[1]

Beginning in about 2011, Plum invested approximately $1 million to develop an application to "draw real-time patient data directly from the EHR." (Conneely Decl., Ex. 7 at 6.) The technology developed by Plum included an interfacing software application that could retrieve and analyze Plum data stored on the MatrixCare database to produce real-time trends and patient data analysis. (*Id.* Ex. 9 at 2–3.) According to Plum, Plum developed its own technology because the MatrixCare system was incapable of using Plum's skilled nursing facilities' data to identify trends. (*Id*. Ex. 7 at 8.) Plum wished to "move past the limitations of single patient records, and gain the ability to process the aggregate facility data electronically." (*Id*.)

At some point in 2011, MatrixCare allowed Plum (including Plum employees working on the application) direct access to MatrixCare's technology, including the aspects of the database that MatrixCare claims is proprietary and subject to trade secret protection. (*Id.* Ex. 7 at 9.) MatrixCare acknowledges that "Plum used the Bridge to access the production database locate [sic] on MatrixCare's servers" and concedes that Plum "had access to download a replicated database on Plum's own servers and laptops." (Weber Aff. ¶ 18.) The "replicated database contains all of the data associated with MatrixCare's production database." (*Id*.)

---

[1]     The Court notes that the Agreement is almost completely redacted, making it impossible for this Court to fully view the terms.

**B.    Plum Begins Work with MatrixCare's Direct Competitor, Defendant Netsmart**

On April 25, 2019, MatrixCare learned, via a public press release, that MatrixCare's long-time customer, Plum, had entered into a 10-year "strategic partnership" with MatrixCare's chief competitor, Defendant Netsmart. (Weber Aff. ¶ 30, Ex. B.) MatrixCare also learned that the companies were in the process of merging. (Weber Aff. ¶ 31.)[2] It also learned that former Plum employees had become employees of Netsmart. (*Id.*)

This news prompted MatrixCare to disable Plum's access to the Bridge. (*Id.* ¶ 33.) According to MatrixCare, disabling the Bridge cut Plum's direct access to the confidential and proprietary aspects of "MatrixCare's database and platform via the Bridge while still allowing Plum to use MatrixCare's data base and platform to care for its patients in a manner that did not give Plum—and Plum employees transitioning to Netsmart—access to MatrixCare's Proprietary Information." (*Id.*) In follow-up discussions with Plum, MatrixCare offered Plum an alternative tool, called MyData,[3] to provide the majority of the functionality requested. (*Id.*) Plum took the position that the

---

[2]    Plum is in the process of transitioning its organization over to Netsmart's competing EHR offering and the transition is set to be complete by the end of 2020. (Conneely Decl., Ex. 9 at 7.)

[3]    After Plum developed its own interface to the MatrixCare EHR database containing Plum's patient data, MatrixCare developed MyData and MyAnalytics. These tools became commercially available in 2017 and MatrixCare offers these tools to its other customers. (Conneely Decl., Ex. 9 at 6.)

MyData tool was not feasible, because it did not provide the real-time analysis crucial to the care of patients. (Conneely Decl., Ex. 9 at 6.)

### C.    The California Action Between Plum and MatrixCare

Plum sued MatrixCare in California State Court on a breach of contract claim on May 30, 2019 (the "California Action"). (Conneely Decl., Ex. 7.) Netsmart is not a party to the California Action. Plum immediately sought a temporary restraining order to obtain access to the Bridge and Plum's patient information data. (*Id.*) A hearing was held on June 6, 2019. (Doc. No. 12, Decl. of Lawrence Green ("Green Decl.") ¶ 6, Ex. 3.) MatrixCare participated in the California hearing. (*Id.*) The California Court issued a TRO the same day. (*Id.*; Weber Aff., Ex. C.) The TRO ordered MatrixCare to "immediately restore Plum's direct extranet access to the Electronic Health Record (EHR) production database, via the use of the parties' previously set-up Virtual Private Network (VPN) (i.e. the Bridge)." (Weber Aff., Ex. C ¶ 1.) MatrixCare was also ordered to "permit the following user accounts to log into the VPN, and to have all of the same access they did prior to the cut-off: Plum_batchrunner, Plum_Primeview." (*Id.* ¶ 2.) Three other proposed accounts were stricken from the proposed order by the presiding judge. (*Id.*) According to the California TRO, MatrixCare was to deactivate specific user accounts. (*Id.* ¶ 3.) Plum was also directed to cause certain individuals to sign Non-Disclosure agreements ("NDA") with MatrixCare. (*Id.* ¶ 5.) A handwritten provision was added: "Ethical wall will be established at Netsmart to wall off former Plum employees." (*Id.* ¶ 6.)

A form NDA, attached to the TRO, described the "Purpose" of the NDA as follows:

> Individual and MatrixCare wish to exchange information of a proprietary and confidential nature for the sole and exclusive purpose of maintaining the direct extranet connection used by Plum Healthcare Group L.L.C. ("Plum") to access patient and other real-time data stored in the MatrixCare EHR pursuant to the 2006 Agreement" with Achieve Matrix Applications and Services ("2006 Agreement") between MatrixCare and Plum (hereinafter, the "Purpose").

(*Id.*) The NDA also provided that "Each party is willing to disclose Confidential information on conditions which assure that the Confidential Information will be protected from improper use or public disclosure." (*Id.*) The Recipients of Confidential Information agreed to non-disclosure for a period of three years. (*Id.*)

A motion for a Preliminary Injunction in the California Action is set for August 23, 2019. (Green Decl., Ex. 3 at 32.)

### D.    Alleged Wrongdoing by Netsmart Before and After California TRO Issued

MatrixCare commenced this lawsuit on June 26, 2019, after learning of "back door" access to the confidential and proprietary aspects of MatrixCare's database and platform via the Bridge by Netsmart employees. Specifically, MatrixCare determined that the computer account, Plum_batchrunner, was used to humanly access the MatrixCare system. (Doc. No. 15, Affidavit of Mark Lanterman ("Lanterman Aff.") ¶ 16.) According to MatrixCare, this computer account was not intended to provide manual human access and the California TRO was intended to prohibit human access. (Green Decl., Ex. 3 at 20,

6

32.) After human access was achieved, the individual ran queries against the data using the Bridge access, which allegedly resulted in the downloading of MatrixCare's "proprietary schema." (Weber Aff. ¶¶ 50–51.)

After learning of this access, counsel for MatrixCare contacted Plum's attorneys. (*Id*. ¶ 52.) Plum investigated and quickly conceded that between June 7 and June 12, Chris San Nicolas and Kyle Hansen, "former Plum employees, did in fact manually access the Bridge." (*Id*.) San Nicolas has confirmed that he is a Netsmart employee as of May 1, 2019. (Doc. No. 26, Decl. of Christopher San Nicolas ("San Nicolas Decl.") ¶ 2.) He signed the form NDA on June 7, 2019. (*Id.* ¶ 18, Ex. A.) San Nicolas explained his access of the Bridge as follows:

- He manually logged into the MatrixCare system to see if it was working after he heard that access had been restored.
- He was unaware of any restrictions that had been imposed.
- He (and others) ran queries to make sure that the connection was working and noted that the "sandbox" database was not available and they were directed to a "production" database.
- They updated a script to access the production database instead.
- After doing this work, he was "told by someone in Plum's legal department to no longer manually log in to the MatrixCare system."

(*Id.* ¶¶ 8–10.)

MatrixCare's investigation, however, indicated that "the users were seeking information, not resolving a technical issue." (Weber Aff. ¶ 53.) MatrixCare's investigation also revealed at least 66 queries were made by humans. During the queries, multiple attempts were made to access information. (*Id.* ¶ 54.) According to MatrixCare's Chief Technology Officer Joseph Weber, "the logs confirm MatrixCare's computer

7

systems were accessed by humans and the proprietary schema downloaded." (*Id*. ¶ 55.)
Additional activity was observed on June 18, 2019, indicating that the username
Plum_batchrunner was accessing the computer application Informatica. (*Id*. ¶ 56.) The
California TRO excluded the use of the Plum_informatica login. (*Id*.) Thus, MatrixCare
asserts that the Plum_batchrunner was improperly used by a human to access
MatrixCare's proprietary and confidential technology. (*Id*. ¶¶ 56–66.)

The parties disagree as to whether human access, using the batchrunner account,
violated the California TRO. It is MatrixCare's position that human access was clearly
barred by the California TRO, even though such language is not specifically included in
the Order, citing to the hearing transcript in the California case.[4] In an email dated
June 12, 2019, counsel for Netsmart wrote: "In order to resolve any differences that the
parties may have in how they read the TRO and in the spirit of cooperation we will
explicitly agree not to allow humans to log in via the Plum batchrunner or Plum
primeview accounts going forward, provided that MatrixCare in turn agrees to provide
responsive and timely technical support to resolve problems with the bridge." (Conneely
Decl., Ex. 1 at 8.)

---

[4]    At the end of the California hearing, MatrixCare's counsel asked the Court to
include the provision offered by Plum to create an ethical wall by a date certain. (Green
Decl., Ex. 3 at 31.) Plum suggested that the ethical wall would be established at Netsmart
to wall off former Plum employees. (*Id*.) MatrixCare's counsel then suggested that the
order might "say that no Plum or Netsmart employee will go into the computer base log
and alter the program." (*Id*. at 32.) The presiding judge did not include this language;
however, Plum's counsel stated: "It's on the record, your Honor. We will agree to that."
(*Id*.) This Court agrees that the transcript provides support for MatrixCare's position.

MatrixCare brought the instant motion for injunctive relief against Netsmart claiming its trade secrets and proprietary database technologies are not protected by the California TRO since Netsmart is not a party in the California Action. Moreover, MatrixCare alleges that Netsmart has violated MatrixCare's intellectual property rights and other laws because former Plum employees—now Netsmart employees —improperly accessed the proprietary aspects of MatrixCare's database.[5]

## II.     ANALYSIS

### A.     Legal Standard

A TRO is an extraordinary equitable remedy, and the movant bears the burden of establishing its propriety. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The purpose of a TRO is to "preserve the status quo[[6]] until the merits [of the case] are determined." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).[7]

In determining whether to issue a TRO, the court considers: (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between the harm to the movant in the absence of relief and the harm that the relief may cause the non-

---

[5]     MatrixCare offered at the hearing before the undersigned that there appeared to be continued access. However, evidence of continued access by Plum or Netsmart has not been developed and presented to the Court.

[6]     MatrixCare appeared to argue that the "status quo" should be set for a date prior to the commencement of this litigation. This Court disagrees. The status quo is the "situation that currently exists." Black's Law Dictionary. (11th ed. 2019).

[7]     These factors are the same whether the relief sought is a preliminary injunction or temporary restraining order. *See, e.g., S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project*, 877 F.2d 707 (8th Cir. 1989) (affirming district court's application of *Dataphase* factors to temporary restraining order analysis).

moving party, (3) the likelihood of the movant's ultimate success on the merits, and (4) the public interest. *Dataphase*, 640 F.2d at 114.

"The core question is whether the equities 'so favor the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (quoting *Dataphase*, 640 F.2d at 113). "Moreover, the burden is higher on a party that seeks a mandatory preliminary injunction – one which 'alters the status quo by commanding some positive, act, as opposed to a prohibitory injunction seeking only to maintain the status quo.'" *TruStone Fin. Fed. Credit Union v. Fiserv, Inc.,* 14-cv-424 (SRN/SER), 2014 WL 12603061 at *1 (D. Minn. Feb. 24, 2019) (quoting *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011)).

### B.    Likelihood of Success[8]

"An injunction cannot issue if there is no chance on the merits." *Mid–Am. Real Estate Co. v. Ia. Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). However, the question is not whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation." *Watkins*, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143. This factor simply requires the movant to show that it has a "fair chance of prevailing" on its

---

[8]    At the hearing, MatrixCare withdrew arguments relating to its Lanham Act and Defamation claims.

claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Moreover, "[w]hile no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead*, *Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quotation marks and internal citations omitted). To satisfy this factor, the movant need only show likelihood of success on the merits on a single cause of action, not every action it asserts in its complaint. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

### 1.    Trade Secret Misappropriation

To prevail on its claims that Netsmart violated the Defend Trade Secrets Act ("DTSA") or the Minnesota Uniform Trade Secrets Act ("MUTSA"), MatrixCare must show the existence and misappropriation of a trade secret. *CPI Card Group, Inc v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018). A trade secret is information that is not generally known or readily ascertainable, has value as a result of its secrecy, and is the subject of reasonable efforts under the circumstances to protect its secrecy. *Wyeth v. Nat. Biologics, Inc*., 395 F. 3d 897, 899 (8th Cir. 2005).

> "Misappropriation," in turn, is defined as the "acquisition," "disclosure," or "use" of another's trade secrets by "improper means." *See* Minn. Stat. § 325C.01, subdiv. 3; 18 U.S.C. § 1839(5). The MUTSA defines improper means as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Minn. Stat. § 325C.01, subdiv. 2. The definition of misappropriation under the DTSA is, almost verbatim, the same. *See* 18 U.S.C. § 1839(5).

*CPI Card Group*, 294 F. Supp. 3d at 807–08.

"In order to successfully seek protection of a trade secret, a plaintiff must identify the trade secret with sufficient specificity so that appropriate relief may be granted." *CardioVention, Inc. v. Medtronic, Inc*., 483 F. Supp. 2d 830, 844 (D. Minn. 2007) (internal quotations and citations omitted). For example, to claim software contains trade secrets, a plaintiff must come forward with evidence sufficiently identifying those portions of the software or combination of features within the software that are not generally known in the industry. *See IDX Sys. Corp. v. Epic Sys.*, 285 F.3d 581, 583–84 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret]."); *Imax Corp. v. Cinema Tech., Inc*., 152 F.3d 1161, 1164–65 (9th Cir. 1998) ("The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'") (citation omitted).

In its moving papers, MatrixCare describes the technology as MatrixCare's "EHR software (including source code), the data base structure, a proprietary schema that MatrixCare developed to link its software and database, and a direct database access link that was developed to provide direct access to data (i.e., the Bridge as discussed more herein). The technology also includes the control tables associated with the software and the program login that links the program elements together. This information is referred to herein as 'Proprietary Information.'" (Weber Aff. ¶ 11.) At the hearing, MatrixCare conceded that it was not claiming the Bridge was MatrixCare's Proprietary technology. (Doc. No. 34, Hrg Tr. at 34.) Further, at the hearing, MatrixCare amended its definition

12

of "Proprietary Technology" to include the access accounts and information obtained via the access. (*Id.* at 38.)

On this record, the Court finds that MatrixCare has not sufficiently identified which aspects of its proprietary technology are "known to the trade, and which are not." *IDX*, 285 F.3d at 584. Without a clear explanation of what MatrixCare's trade secrets are, there is a substantial question as to what extent the alleged secrets are generally known or readily ascertainable. This weighs heavily against an early finding that the materials accessed and allegedly downloaded contain trade secrets.[9]

There are also serious questions—without the benefit of a more developed record—as to whether MatrixCare took reasonable efforts to maintain the secrecy of the technology at issue. The 2006 Agreement between MatrixCare and Plum includes a confidentiality provision and makes Plum "responsible for protection against unauthorized use of the Software by persons at [Plum's] premises." (Weber Aff., Ex. A at 13.)[10] Even so, a contractual agreement to not use a company's property or proprietary information may not be sufficient. *See Electro–Craft Corp. v. Controlled Motion, Inc.*,

---

[9]    The Affidavit of Mark Lanterman, which was publicly filed as Doc. No. 15, offered a helpful illustration, describing the "schema is like a blueprint, a database is a house, and its components (tables) are akin to rooms." (Lanterman Aff. ¶ 18.) Regardless, MatrixCare has not specified which aspects of the blueprint, house, and rooms are trade secrets.

[10]    According to the Acceptable Use Policy, Plum could not use the Achieve Network to create, transmit, distribute, or store material that: "Violates a trademark, copyright, trade secret, or other intellectual property rights of others." (Webber Decl., Ex. A, App. 2 at 16.)

332 N.W.2d 890, 901–02 (Minn. 1983) (finding that the signing of a confidentiality agreement is "not enough"). MatrixCare offers many examples of its efforts to control access *internally,* within MatrixCare, but little relating to third-party access. As discussed above, MatrixCare voluntarily allowed Plum and Plum employees to access MatrixCare's Proprietary Information via the Bridge. The record is undeveloped regarding any steps MatrixCare took to protect the proprietary aspects of the MatrixCare database after Plum began access via the Bridge in 2011.[11]

The Court further finds that MatrixCare has not provided sufficient evidence to satisfy the "misappropriation" element of a trade secret claim at this preliminary stage of the case. "An injunction may issue only where there is misappropriation or threatened misappropriation of trade secrets. Merely showing that the employee had knowledge of trade secrets is not enough." *Midwest Sign & Screen Printing Supply Co. v. Dalpe,* __ F. Supp. 3d __, 2019 WL 2067867, at *10 (D. Minn. May 10, 2019) (quoting *Int'l Bus. Mach. Corp. v. Seagate Tech., Inc*., 941 F. Supp. 98, 101 (D. Minn. 1992)).

Indeed, the evidence produced by Netsmart arguably contradicts a claim of misappropriation based upon the actions of San Nicolas and Hansen. The NDA presented to San Nicolas, and signed on June 7, 2019, did not make any mention that the individuals had no access to the MatrixCare database. Indeed, the NDA could suggest otherwise:

---

[11]    For example, the record before the Court does not establish any steps MatrixCare took—or required Plum to take—when Plum employees were given access accounts. (*See* Weber Aff. at ¶¶ 13–17.) The only NDA of record in this case binding individual employees is the 2019 NDAs signed as part of the California TRO.

> Individual and MatrixCare wish to exchange information of a proprietary
> and confidential nature for the sole and exclusive purpose of maintaining
> the direct extranet connection used by Plum HealthGroup, LLC ("Plum") to
> access patient and other real-time data stored in the MatrixCare EHR
> pursuant to the 2006 Agreement with Achieve Matrix Applications and
> Services ("2006 Agreement") between MatrixCare and Plum (hereinafter,
> the "Purpose.")

(San Nicolas Decl. ¶ 18, Ex. A.) San Nicolas and Hansen's access to the database appears

consistent with the Purpose of the NDA agreed to by MatrixCare. It is unclear whether

San Nicolas or Hansen were sufficiently briefed about the California TRO. MatrixCare

has presented no evidence at this stage to establish that any former Plum employee

breached the ethical wall established pursuant to the California TRO. Again, discovery

may reveal otherwise. But at this preliminary stage, this factor favors denial of the

Motion for TRO and injunctive relief sought by MatrixCare.

### 2.      The Computer Fraud and Abuse Act

The Court next evaluates MatrixCare's likelihood of success on the Computer

Fraud and Abuse Act ("CFAA") claim. MatrixCare argues that the CFAA imposes civil

liability against Netsmart because the employee access to MatrixCare's databases by San

Nicolas and Hansen was "unauthorized" and caused MatrixCare more than $5,000 in

damages. Netsmart argues that MatrixCare cannot show a likelihood of success because

the "former Plum employees accessed the Plum patent [sic] database as they had done for

years in an effort to repair the Bridge and without knowledge of the TRO. There was no

attempt to defraud." (Doc. No. 25, Def.'s Br. at 11.)

MatrixCare argues that Netsmart violated 18 U.S.C. § 1030(a)(4) by "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value[.]" MatrixCare further argues the violation is unrebuttable because it has shown unauthorized access and damages. This Court disagrees. (Def.'s Br. at 26.)

First, MatrixCare has not established a private right of action based on a violation of § 1030(a)(4). Other courts in this District have found no such private right of action. In *Hot Stuff Foods v. Dornbach*, Judge Doty found:

> While some circuits have found that the CFAA authorizes a civil action for a violation of any of the subsections of § 1030(a), the Eighth Circuit has not addressed this issue. *Condux Int'l, Inc. v. Haugum*, No. 08–4824, 2008 WL 5244818, at *3 (D. Minn. Dec. 15, 2008) (collecting cases). Other courts in the District of Minnesota have previously determined that "[a] party cannot bring a civil action [under the CFAA] based on provisions other than § 1030(a)(5)." *Cenveo Corp. v. CelumSolutions Software GMBH & Co. KG*, 504 F. Supp. 2d 574, 580 (D. Minn. 2007) (citing *McLean v. Mortgage One & Fin. Corp.*, No. 04–1158, 2004 WL 898440, at *2 (D. Minn. Apr. 9, 2004)). *But see Czech v. Wall Street On Demand, Inc.*, 674 F. Supp. 2d 1102, 1110–14 (D. Minn. 2009) (allowing civil action for violation of 18 U.S.C. § 1030(a)(2)(C)). In the instant case, the court finds no reason to abandon the precedent set forth in *Cenveo* and *McLean*.

726 F. Supp. 2d 1038, 1045 (D. Minn. 2010); *see also Harley Automotive Group, Inc. v. AP Supply, Inc*., No. 12-cv-1110 (DWF/LIB), 2013 WL 6801221, at *6 (D. Minn. Dec.13, 2013) (recognizing that courts in this district have determined that a party cannot bring a civil action under the CFAA based on provisions other than § 1030(a)(5)). Thus, it is unlikely that Plaintiff's claim could survive as a matter of law.

16

Without discussing any cases within the District of Minnesota or Eighth Circuit, MatrixCare relies solely on *United States v. Nosal*, 08-cr-237, 2013 WL 4504652 (N.D. Cal. Aug. 15, 2013), to support its position that it has already established liability on this claim. However, *Nosal* was a criminal case and the factual circumstances are distinguishable. Moreover, this Court finds nothing in *Nosal* to suggest that MatrixCare need not show anything more than "unauthorized access" to prove intent to defraud. *See Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018) (recognizing that unauthorized access under § 1030(a)(4) must be done knowingly and with intent to defraud). Thus, even if a civil claim based on a § 1030(a)(4) violation was permitted, MatrixCare is unlikely to prevail based on the lack of evidence at this stage.[12] Thus, this factor favors denial of MatrixCare's Motion for TRO.

### C.    Other Factors

"[A]n injunction cannot issue if there is no chance of success on the merits." *Mid–Am. Real Estate Co. v. Iowa Realty Co., Inc*., 406 F.3d 969, 972 (8th Cir. 2005); *see also CDI Energy Servs. Inc. v. W. River Pumps, Inc*., 567 F.3d 398, 402 (8th Cir. 2009) (stating that "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied"); *McMahon v. Delta Air Lines, Inc*., 830 F. Supp. 2d 674, 688 (D. Minn. 2011) ("If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors—irreparable harm, balance of harms, and the public interest—weigh in the

---

[12]    Even if no evidence of intent is required, this Court does not conclude that access can only be described as unauthorized.

party's favor."). This Court could end the inquiry here because of MatrixCare's failure to identify its trade secret and because the CFAA claim (even if permitted as a matter of law) is unsupported on all the necessary elements. Even if a likelihood of success on the merits was found, an analysis of the other three factors does not favor the broad injunctive relief Plaintiff seeks.

### 1.    Irreparable Harm

The second *Dataphase* factor is irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "likely in the absence of an injunction," *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008), "great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted).

In determining whether MatrixCare has demonstrated irreparable injury absent the requested relief, the Court takes judicial notice of the terms of the California TRO, including the provision that an ethical wall be established at Netsmart to wall off former Plum employees. Netsmart has provided evidence that such a wall has been established and protocols put in place to enforce such wall. (Conneely Decl. ¶ 6, Ex. 5.) In addition, evidence has been presented that at least one former Plum employee, San Nicolas, has signed the form NDA attached to the California TRO. (San Nicolas Decl. Ex. A.) Apparently, Hansen has also signed. (Conneely Decl. ¶ 2, Ex. 1.) Accordingly, at this time and based on the record before the Court, MatrixCare has not made a "clear showing

of immediate irreparable injury." *Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc*., No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation and internal quotation marks omitted).

### 2.    Balance of Harms to the Parties and Other Interested Parties, Including the Public

"[T]he potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant." *Prudential Ins, Co. of America v. Inlay*, 728 F. Supp. 2d 1022, 1031 (N.D. Iowa 2010) (citing *Baker Elec. Co-op*., 28 F.3d 1466, 1473 (8th Cir. 1994). "Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action." *Id*. (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993)). "Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated." *Id*. Here, Netsmart has represented that it will abide by the ethical wall term included in the California TRO. (Conneely Decl. ¶ 6, Ex. 5.) Moreover, as noted above, Netsmart has created and distributed a protocol to enforce the ethical wall, which informed the former Plum engineers not to run anymore manual SQL queries or otherwise log into the Bridge. (*Id.*)

The public has an interest in fair competition and protection of intellectual property rights. On the other hand, as the California court noted, there is a real public interest in the continuation of the care to the nursing home patients served through third-party Plum. The Court thus finds the balance of harms is neutral.

19

### III.    Conclusion

Based on all of the above, and balancing all of the *Dataphase* factors, this Court concludes that MatrixCare's Motion for TRO should be **denied. Counsel for the parties should contact the Chambers of Magistrate Judge Steven. E. Rau to schedule a Rule 16 Conference and to discuss the need for expedited discovery.**

### RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's MatrixCare Inc.'s Motion for a Temporary Restraining Order (Doc. No. 9) be **DENIED.**

Dated: July 12, 2019.                    *s/ Becky R. Thorson*_____
                                         BECKY R. THORSON
                                         United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. A party may file and serve specific written objections to this Report within **seven days**. A party may respond to those objections within **seven days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).